# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| VANESSA ROBERTSON,<br><br>                      Plaintiff,<br><br>v.<br><br>STATE OF WISCONSIN DEPARTMENT OF HEALTH SERVICES, MARLIA MATTKE, and TONYA EVANS,<br><br>                      Defendants. | Case No. 18-CV-116-JPS<br><br><br>**ORDER** |

**1.    INTRODUCTION**

The plaintiff, Vanessa Robertson ("Robertson"), has at all times relevant to this litigation been employed by defendant Wisconsin Department of Health Services ("DHS"). She brings this action under Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1983 against DHS and two DHS employees, Marlia Mattke ("Mattke") and Tonya Evans ("Evans"), alleging retaliation for complaining of discrimination in the workplace. The defendants moved for summary judgment, and their motion is now fully briefed and ripe for adjudication. (Docket #16). For the reasons explained below, their motion will be granted and this case will be dismissed.

**2.    STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56 states that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). "Material facts" are those facts which "might affect the outcome of the suit," and "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, to demonstrate a genuine dispute about a material fact, a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The Court construes all facts and reasonable inferences in a light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010).

3. **RELEVANT FACTS**

The following factual overview presents the parties' evidence in a light most favorable to Robertson. Additional facts relevant to Robertson's claims will be addressed throughout the Court's analysis of those claims.

Robertson became deputy director of Milwaukee Eligibility Services ("MilES"), a bureau within DHS, in October 2009. (Docket #31 at 2). MilES employees determine eligibility for medical assistance, FoodShare, child care and caretaker supplement entitlements for Milwaukee residents. (Docket #20 at 2–3). In her role as deputy director, Robertson directly

supervised a staff of 10-20 people and indirectly supervised about 350 others. (Docket #31 at 3).

In January 2014, a MilES employee contacted Juanita Brown-Small ("Brown-Small"), a MilES section chief, to report that MilES bureau director Ed Kamin ("Kamin") had told the employee that he was going to "pimp her out" to another agency. *Id.* at 4. Brown-Small brought the complaint to Robertson, and the two women together brought the complaint to human resources on January 31, 2014. *Id.* As a result of the complaint, an extensive investigation was undertaken regarding Kamin's conduct. *Id.* at 4–5. The investigation culminated in the production of a report about Kamin's discriminatory and harassing conduct that included inappropriate comments pertaining to sex, race, and disability. *Id.* at 5–8; (Docket #20 at 5). Around April 23, 2014, Kamin resigned in lieu of termination. (Docket #20 at 5). However, pending the investigation, Kamin was suspended from his position almost immediately. *Id.*

Within a week after his removal, Robertson was asked to run the day-to-day operations of MilES, as she was the highest-ranking supervisor present at MilES. *Id.* She worked in conjunction with her supervisor, deputy administrator Mattke, who worked at DHS headquarters in Madison. *Id.* During Robertson's time as acting director, the agency ran smoothly. (Docket #31 at 12).

Around April 23, 2014, Mattke and Kevin Moore ("Moore"), the assistant deputy secretary of DHS, met with Robertson and the MilES section chiefs in Milwaukee to inform them of Kamin's resignation and invite the employees to contact them with questions. (Docket #20 at 5). Robertson and the section chiefs conveyed to Mattke and Moore that they feared retaliation from management in Madison, particularly because

Kamin had boasted about his connections in Madison prior to the investigation. (Docket #31 at 9).

In September 2014, DHS conducted an open recruitment for a new MilES director. (Docket #20 at 6). DHS received 57 applications for the position. Amongst those applicants were Robertson and a handful of other MilES employees. *Id.* at 7. DHS screened the resumes, interviewed several people, and narrowed the candidate field to three people: Robertson, a second MilES employee named Danyel McNiel ("McNeil"), and Evans. *Id.* Mattke and Moore conducted the interviews in Madison. *Id.* at 8.

Robertson and Evans were the strongest candidates. *Id.* at 8. Their professional backgrounds were comparable: both had headed social services agencies, directed policy, managed supervisory-level employees, and headed organizations with more than 150 employees. *Id.* at 8–10. Their qualifications differed in certain respects as well, including that Robertson had five years of experience working for MilES and was familiar with the business, whereas Evans had never worked at MilES. On the other hand, Evans held a Master of Science in Administration and Robertson did not have a bachelor's degree. *Id.*

Mattke testified that she and Moore, who together made the hiring decision, were impressed with Evans during her interview, particularly because she spoke in broad brushstrokes about developing a strategic plan for MilES, explained how she would garner teamwork amongst staff, and exemplified the leadership qualities essential to running a large and critically important bureau. *Id.* at 11. According to Mattke, Robertson's interview was not as impressive. *Id.* at 9. For example, Mattke did not believe Robertson had a vision for improving the organization or a big-picture strategic vision. *Id.* DHS hired Evans. *Id.* at 11.

Evan's first day at DHS was in November 2014. *Id.* at 12. Evans soon had individual meetings with Robertson and all of the section chiefs. *Id.* at 13. The parties dispute some of the content of these meetings, but the facts they dispute are largely irrelevant. *See id.* at 12–15 and (Docket #23 at 7–10). To the extent the content of these meetings is relevant, it is discussed further in the analysis section below.

Robertson claims that from the beginning of Evans' tenue, Evans antagonized, insulted, and undermined her. (Docket #31 at 19). For example, in Evans' first meeting with Robertson and Brown-Small, Robertson says that Evans accused them of having rigged the hiring system in a nepotistic manner. *Id.* In the same meeting, Evans also made it clear to them that she "would not be forced out as Mr. Kamin had been." *Id.* at 18.

As time went on, the hostility continued. In her first section chief meeting, Evans sat with her back to Robertson. She also made statements during meetings implying that Robertson had been doing things the wrong way while she was the acting director. *Id.* at 21. Evans told Robertson to "be quiet" at a meeting, and would demonstrate by her body language, including rolling her eyes, that she did not value Robertson's input. *Id.* In meetings with community groups, Evans would often talk over and disrespect Robertson. *Id.* at 26–27. Eventually, Robertson stopped going to those meetings. *Id.* at 27. Evans also discouraged section chiefs from meeting with Robertson, their manager. *Id.* Evans ultimately demanded that she be present every time a section chief met with Robertson. *Id.* at 28. At one point, McNeil overhead Evans talking to someone about Robertson, saying "Well, she can just leave" and "They can send her to Baraboo for all I care." *Id.* at 23. Evans also took away one Robertson's job duties—resource allocation—at which Robertson believed she excelled. *Id.* at 23–24.

Dana Thompson ("Thompson"), a unit chief at MilES, testified that Evans treated other section chiefs better than Robertson, Brown-Small, and herself. *Id.* at 30. For example, Mike Poma ("Poma"), a section chief who took no part in the investigation of Kamin, slept during section chief meetings and was not reprimanded by Evans. *Id.* Jerry Turner ("Turner"), another section chief who did not participate in the Kamin investigation, was also treated favorably. For example, on one occasion Turner sought approval for a vacation day directly from Evans even though he was supposed to report to Robertson. *Id.* at 31.

On February 20, 2015, Robertson sent an email to Mattke and Moore requesting a meeting to discuss her "unhealthy" work environment. *Id.* at 32. Mattke responded by offering a date and time for the meeting, but further stated that Evans, as Robertson's direct supervisor, would be present as well. *Id.;* (Docket #29-2). Robertson responded that she did not want Evans included in the meeting. (Docket #29-2). Mattke asked for an explanation and Robertson responded that she was not comfortable discussing her issues in Evans' presence. *Id.* It is not clear whether the meeting ever happened.

Approximately one hour after Robertson sent her February 20 email, Evans sent an email to the entire MilES staff in which she modified the way employees were to contact human resources. (Docket #31 at 33). Specifically, Evans directed staff to speak with a direct supervisor, following the chain of command, before contacting the human resources department. *Id.;* (Docket #18-1). This, Evans said in her email, was necessary in light of the "great demand" being placed on human resources and the department's limited resources. (Docket #18-1). According to the procedure

laid out in the email, Robertson would have been required to seek Evans' approval before speaking with human resources. (Docket #31 at 33).

In 2016, several employees approached Evans and complained that Robertson acted in an unprofessional manner. In July 2016, a MilES employee submitted a written complaint that Robertson bullied, harassed, and intimidated him and other employees. (Docket #20 at 17). DHS hired personnel managers from another state agency to investigate the complaint against Robertson. *Id.* After interviewing many staff members, including Robertson, the investigators found Robertson had engaged in acts of mismanagement and unprofessional and disrespectful behavior. *Id.* This behavior included undermining the authority of the bureau director, sabotaging management's efforts to create an effective work environment, fostering factions and creating barriers for communication in the work space, engendering distrust of management among subordinates, and expressing favoritism which created feelings of unfairness and a lack of trust. *Id.* at 17–18. In February 2017, as a result of the investigation, Robertson was demoted. *Id.* at 18–19.[1]

4. **ANALYSIS**

On these facts, Robertson claims that DHS retaliated against her for complaining about workplace discrimination in violation of Title VII in two ways: first, by passing her over for a promotion to the position of director and, second, (through its new director, Evans) treating her poorly and creating a hostile workplace.[2] Robertson's complaint also alleges a claim

---

[1]Robertson is not pursuing a claim of Title VII retaliation based on her demotion. (Docket #23 at 13).

[2]Robertson's complaint appears to allege Title VII claims against not only DHS, but against Evans and Mattke as well. (Docket #1 at 10). The parties'

under the Equal Protection Clause of the Fourteenth Amendment against all defendants. (Docket #1 at 10). However, Robertson failed to defend her purported equal protection claim in opposition to summary judgment. *See generally* (Docket #21). The claim is, therefore, abandoned and will be dismissed. *See Palmer v. Marion Cty.*, 327 F.3d 588, 597 (7th Cir. 2003).[3]

Therefore, the only claim currently before the Court is Robertson's Title VII claim against DHS based on its failure to promote her to director and based on Evans' creation of a hostile work environment. Those two theories of liability will be addressed separately below. With no claims pending against them individually, Evans and Mattke must be dismissed.

### 4.1 Failure-to-Promote

Title VII prohibits employers from discriminating against employees on the basis of "race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a); *see also Lewis v. City of Chicago*, 496 F.3d 645, 650 (7th Cir. 2007). In addition, Title VII also bars employers from retaliating against

---

summary judgment submissions to do not directly address against whom Title VII liability is alleged. However, even assuming Robertson meant to bring claims under Title VII against Evans and Mattke individually, those claims must be dismissed because Title VII authorizes suit only against an employer as an entity, not against individual people who are agents of the employer. *See Smith v. Bray*, 681 F.3d 888, 896 n.2 (7th Cir. 2012), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764 (7th Cir. 2016); *see also Williams v. Banning*, 72 F.3d 552, 555 (7th Cir. 1995) ("A supervisor does not, in his individual capacity, fall within Title VII's definition of employer.").

[3]In any event, such a claim, which the Court assumes from the complaint would be based on the same allegations that underlie the Title VII claim, is not tenable here. "[T]he right to be free from retaliation may be vindicated under the First Amendment or Title VII, but not the equal protection clause." *Boyd v. Ill. State Police*, 384 F.3d 888, 898 (7th Cir. 2004) (citation omitted); *see also Gray v. Lacke*, 885 F.2d 399, 414 (7th Cir. 1989) ("Gray's right to be free from retaliation for protesting sexual harassment and sex discrimination is a right created by Title VII, not the equal protection clause.").

employees who engage in protected activity by exercising their Title VII rights. *See Poullard v. McDonald*, 829 F.3d 844, 855–56 (7th Cir. 2016); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 53 (2006). To succeed on a retaliation claim, a plaintiff must show that "(1) she engaged in a statutorily protected activity; (2) [her employer] took a materially adverse action against her; and (3) there existed a but-for causal connection between the two." *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017); *see also Freelain v. Vill. of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018); *Williams v. Office of Chief Judge of Cook Cty. Ill.*, 839 F.3d 617, 627 (7th Cir. 2016).

With respect to the failure-to-promote claim, the defendants agree that Robertson engaged in statutorily protected activity by reporting Kamin's discriminatory conduct and that Robertson suffered an actionable adverse action by not being chosen for the director position. *See* (Docket #19 at 9, 14–18). Therefore, the only element in dispute is whether Robertson's complaint about Kamin was the but-for cause of DHS's decision not to promote her to director.

Robertson, as is typical of many employees complaining of retaliation, has no direct evidence of causation. She must therefore rely on "circumstantial evidence like suspicious timing, ambiguous statements, treatment of similarly-situated employees, and any other relevant information that could permit an inference of retaliation." *Burton*, 851 F.3d at 697 (citing *Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 869 (7th Cir. 2013)). The "dispositive question" is "whether a reasonable [fact-finder] could find a but-for causal link between the protected activities and adverse actions at issue." *Id.* If the defendant employer presents a non-retaliatory reason for the adverse action, "the true question is whether the proffered

reasons were pretext for retaliation." *Id.* (citing *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 539 (7th Cir. 2013)). Robertson may demonstrate pretext by showing that DHS's "articulated reason for its actions either: 1) had no basis in fact; 2) did not actually motivate its decision; or 3) was insufficient to motivate its decision." *Grayson v. O'Neill*, 308 F.3d 808, 820 (7th Cir. 2002).

Here, DHS has put forward evidence of its non-retaliatory reason for hiring Evans instead of Robertson for the director position: Evans was the stronger candidate. Specifically, DHS has offered declarations and deposition testimony from Mattke and Moore, who conducted the final interviews, indicating that while Robertson and Evans both possessed certain positive qualifications (experience running an organization, working in diverse environments, supervising professional staff, and working with Medicaid, for example), Evans had additional positive traits that Robertson lacked. Most notably, Evans held a master's degree in a relevant field while Robertson did not have any post-secondary degree; Evans competently presented a strategic vision for the organization while Robertson was not able to articulate many changes or strategies that would help the organization develop and improve; and the interviewers were overall more impressed with Evans' positive leadership style, which she described with examples from her past experience.

Robertson counters by presenting four theories as to why it was Mattke's retaliatory motive, not Evans' superior qualifications and interview performance, that caused Robertson to lose out on the job. First, she argues that based on all "objective criteria" she was the more qualified candidate. Specifically, she had extensive experience working in income maintenance and working for the state, while Evans had experience in neither. As to Evans' management experience, Robertson implies that it is

less valuable than hers because Evans' previous organization had a staff of only 156 people, while Robertson had managed an organization of 85-100 employees and then, at MilES, directly managed a staff of 10-12 and indirectly managed 350. Robertson argues that DHS's decision to rely on "subjective criteria" (*i.e.,* Evans' presentation skills, leadership style, and strategic vision) to make its final decision is suspect in light of what are, in her view, glaring differences in the candidates' objective qualifications.

Robertson's list of her qualifications is insufficient to demonstrate that DHS's stated reason for its hiring decision was pretextual. The Seventh Circuit teaches that when an employer's "proffered non-discriminatory reason for its employment decision is that it selected the most qualified candidate, evidence of the applicants' competing qualifications *does not constitute evidence of pretext* 'unless [the plaintiff's case demonstrates that those qualifications] are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue.'" *Cichon v. Exelon Generation Co.*, 401 F.3d 803, 813 (7th Cir. 2005) (quotation omitted) (italics in original). This is true even when an employer's evaluation of applicants is based on subjective criteria like "leadership and behavioral skills." *Id.*; *see also Perfetti v. First Nat'l Bank of Chicago*, 950 F.2d 449, 458 (7th Cir. 1991) ("When a number of qualified persons apply for a few open positions, mere qualification does not mean that the applicant must get the job. And in choosing between different candidates, all of whom are qualified, an employer may legitimately use subjective qualifications."). Both Evans and Robertson possessed positive, though different, qualifications for the job of director. The major outstanding qualification Robertson possessed was income maintenance experience, but Evans had education and leadership

qualities that Robertson lacked. No reasonable factfinder could conclude that Robertson was "clearly better qualified."

Second, Robertson argues that evidence of a retaliatory motive lies in a particular question that was asked of her and McNeil (the two second-round candidates who worked for MilES) but not Evans: how they would move the agency forward in the aftermath of the Kamin investigation and his resignation. *See* (Docket #20 at 9, #23 at 5). No similar question could be put to Evans with the same context (and the defendants do not contend that it was), and therefore, Robertson says, the candidates were not "assessed equally." (Docket #21 at 12). Even if this is true, it stands to reason that when an employer interviews candidates of different backgrounds, some questions will apply to one candidate and not the other. This alone does not demonstrate bias or pretext. And although the question referenced the Kamin investigation, it was both benign and appropriate. As Robertson concedes, the ethos of the department was fragile because of Kamin; the new director would play a role in restoring trust among staff at MilES. Asking both internal candidates about this dynamic, given their intimate involvement in the incident, is therefore not suspicious. Finally, there is no evidence that the interviewers questioned Robertson's role in the Kamin investigation or implied that they considered her a complainer; the question was about a major event at the department that would be insincere to ignore. Robertson presents no authority suggesting impropriety in an interviewer's question about such an event.

Third, Robertson argues that Mattke had been known to promote deputy directors who applied for director positions; in fact, she had recently made four such promotions. None of those deputy directors had previously made a discrimination complaint. However, Robertson also concedes that

she is aware of at least two other instances where external candidates were hired over internal candidates for managerial positions at MilES. (Docket #20 at 12, #23 at 6). This evidence, therefore, does not support a reasonable inference that DHS's stated reason for hiring Evans was pretextual.

Finally, Robertson points to the fact that she and others within MilES feared retaliation from DHS management after Kamin was forced to resign because Kamin had been well-connected with management in Madison and was personal friends with Mattke. Despite acknowledging these concerns, Robertson says, Moore and Mattke did very little to "actually respond to the fears of retaliation." (Docket #21 at 8). For example, Mattke apparently promised to visit the Milwaukee office more, but Robertson claims she did not follow through. In Robertson's view, this evidence is confirmation that DHS management was on Kamin's side, and they intended to retaliate at the "first opportunity." *Id.* at 9. However, this evidence does nothing to inform the question of DHS's motivation to hire Evans over Robertson for bureau director. Fear of retaliation and actual evidence of retaliation are different things.

These shortcomings in Robertson's evidence are all the more damning in light of another significant piece of circumstantial evidence often considered in retaliation cases: the temporal proximity (or lack thereof) of the protected activity to the alleged retaliation. Robertson complained about Kamin in January 2014, interviews for the vacant director position began in September 2014, and Evans started her role as director in November 2014. In other words, at least eight months elapsed between Robertson's discrimination complaint and the alleged retaliation. While a gap of this length does not preclude Robertson's claim as a matter of law, it greatly weakens it. *See Burton*, 851 F.3d at 698 ("Burton has not provided

any evidence that bridges the significant time gap between her final protected activity and Throop's adverse action. While the six-month gap does not preclude Burton's claim as a matter of law, it does substantially weaken it.").

Moreover, in the time between Robertson's complaint and the alleged retaliation, she was given the duties of acting director and was selected for a final-round interview for the director position, finishing as runner-up. This evidence flies in the face of Robertson's theory that DHS intended to retaliate at its "first opportunity." This is not a case of a retaliatory adverse action coming after a long, ongoing pattern of retaliatory behavior. *Cf. Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 829 (7th Cir. 2014) (a plaintiff can establish a link between her protected behavior and the subsequent adverse employment action if the employer engaged in a pattern of retaliatory conduct in the intervening period).

Robertson has not presented evidence sufficient to raise a reasonable inference that DHS failed to promote her in retaliation for her discrimination complaint. She cannot, therefore, take this theory to trial.

### 4.2  Creation of a Hostile Workplace

Robertson's second theory of liability is that upon hiring Evans, DHS management immediately informed her about Robertson's involvement in the Kamin investigation. Thus, Evans would be turned against Robertson and management's retaliation would continue. According to Robertson, Evans went on to create a hostile work environment for her, either acting as DHS's pawn to inflict the retaliation they desired, or because she feared Robertson would also complain about her.

Surviving summary judgment on a hostile work environment claim "requires sufficient evidence demonstrating (1) the work environment was

both objectively and subjectively offensive; (2) the harassment was based on membership in a protected class or in retaliation for protected behavior; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016) (citing *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014)).[4] To determine whether employer conduct is sufficiently severe or pervasive to be actionable, courts consider such factors as "the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance." *Boss*, 816 F.3d at 920. The hostility must be sufficiently severe to "'dissuade[] a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68 (quotation omitted).

Evans' hostile attitude and behavior toward Robertson do not constitute actionable retaliatory harassment. The evidence of a hostile work environment, viewed in Robertson's favor, can be summarized as follows. *See* (Docket #21 at 15–18). In staff meetings, Evans said things like, "That was how [Robertson] used to do things, but I am going to do them the *right* way." She also sometimes told Robertson to "be quiet" in meetings or demonstrated by her body language that she did not value Robertson's input. She rolled her eyes and huffed when Robertson spoke. She criticized and contradicted Robertson in an insulting manner and accused her of

---

[4] As to the fourth element, an employer "is essentially strictly liable if the employee's supervisor created the hostile work environment." *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1043 (7th Cir. 2000). There is an affirmative defense available to employers who claim that they exercised reasonable care to prevent and correct the harassing behavior, *id.* at 1043 n.4, but DHS has not raised the defense here.

rigging the vacation and hiring policies. She demanded to be present at many of Robertson's meetings with other employees. Finally, Evans took away from Robertson the job duty of resource allocation, which Robertson enjoyed and at which she excelled.

This conduct is certainly not polite or congenial, but it is not actionable retaliation. "'[P]ersonality conflicts at work that generate antipathy' and 'snubbing by supervisors and co-workers' are not actionable." *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1107 (7th Cir. 2012) (citation omitted). Similarly, "[u]nfair reprimands or negative performance reviews, unaccompanied by tangible job consequences, do not suffice[.]" *Boss*, 816 F.3d at 919. In other words, "Title VII protects against discrimination, not 'personal animosity or juvenile behavior.'" *Brown*, 700 F.3d at 1105 (citing *Shafer v. Kal Kan Foods, Inc.*, 417 F.3d 663, 666 (7th Cir. 2005)).

The Seventh Circuit's decision in *Brown* is instructive. In that case, two African–American nurses sued their employer alleging discrimination and subsequent retaliation for complaining about the discrimination. *Brown*, 700 F.3d at 1103. The plaintiffs acknowledged they were never formally disciplined, terminated, or denied pay or benefits. *Id.* at 1107. Instead, they argued that the retaliation took other forms, including unfair and hostile treatment. *Id.* They "were 'not being listened to' and getting 'a cold shoulder from management.'" *Id.* Their managers also accused them of "being 'cry bab[ies]' and 'trouble maker[s].'" *Id.*

The court of appeals held that being given the "cold shoulder" by a supervisor "easily falls within th[e] non-actionable category." *Id.* As far as being called a trouble maker, a cry baby, and a spoiled child, the court acknowledged that it was unclear whether those statements were made in

reference to the plaintiffs' discrimination complaints or simply to some other workplace issue. *Id.* But even assuming that those comments referred to the plaintiffs' discrimination complaints, the court remained "confident that the comments were not materially adverse." *Id.* The court then went on to cite other cases where hostile comments and behavior—at least as offensive as the comments and behavior at issue here—were found not sufficiently adverse to impose Title VII liability. *See, e.g., Dunn v. Washington Cty. Hosp.*, 429 F.3d 689, 690–93 (7th Cir. 2005) (nurse complained that a doctor sexually harassed her and doctor responded by asking the nurse to withdraw her complaint in a "nasty and uncivil tone" and told her that "paybacks are hell" but took no other action against her and therefore did not cause any actual injury); *Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009) (being "stared and yelled at . . . is not an actionable harm"); *Recio v. Creighton Univ.*, 521 F.3d 934, 940–41 (8th Cir. 2008) (getting "the silent treatment" from colleagues not materially adverse); *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1214–15 (10th Cir. 2008) (incivility of co-workers at a meeting, including eye-rolling, laughing at plaintiff's opinions, and commenting behind his back, were not materially adverse).

Like the *Brown* plaintiffs, there is no doubt that Robertson experienced an uncomfortable and impolite, even insulting, workplace atmosphere because of Evans' behavior toward her. But that is not sufficient to establish an adverse action that would dissuade a reasonable person from complaining about discrimination. As to Robertson's claim that Evans did not allow her to do one of her previous job duties—resource allocation—there is no evidence that the loss of this particular duty was a "significant or substantial change" to her responsibilities such that it was materially adverse. *Stephens*, 569 F.3d at 790. A change in job duties is "not

materially adverse unless it represents a *significant* alteration to the employee's duties, which is often reflected by a corresponding change in work hours, compensation, or career prospects." *Id.* at 791.

Without having produced sufficient evidence that she suffered an adverse action, Robertson's retaliation claim based on a hostile work environment cannot proceed to trial.

**5.      CONCLUSION**

Robertson has not raised any triable issues as her claims against DHS under either her failure-to-promote or hostile workplace theories. DHS is therefore entitled to summary judgment on her claims. The defendants' motion for summary judgment must be granted and this action will be dismissed in its entirety.

Accordingly,

**IT IS ORDERED** that the defendants' motion for summary judgment (Docket #16) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 2nd day of January, 2019.

BY THE COURT:

J. P. Stadtmueller
U.S. District Judge