CERTIFIED COPY

A True Copy

Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals
### For the Seventh Circuit

———————————

No. 19-1179

VANESSA ROBERTSON,

*Plaintiff-Appellant,*

*v.*

STATE OF WISCONSIN DEPARTMENT OF
HEALTH SERVICES, et al.,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:18-cv-00116-JPS — **J. P. Stadtmueller**, *Judge.*

———————————

ARGUED NOVEMBER 8, 2019 — DECIDED FEBRUARY 7, 2020

———————————

Before RIPPLE, ROVNER, and SYKES, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Vanessa Robertson appeals the district court's grant of summary judgment to the State of Wisconsin's Department of Health Services ("DHS"). In her complaint, Ms. Robertson set forth claims under Title VII of the Civil Rights Act of 1964 and under 42 U.S.C. § 1983, alleging retaliation for complaining of discrimination in the

workplace. She named as defendants DHS and two DHS employees, Marlia Mattke and Tonya Evans.[1]

The defendants moved for summary judgment. In her opposition to that motion, Ms. Robertson did not defend her equal protection claim, and the district court deemed that claim abandoned and dismissed it.[2] The district court dismissed the Title VII claims against Ms. Evans and Ms. Mattke because Title VII authorizes suit only against an employer as an entity, not against individuals.[3]

The district court then granted the summary judgment motion. It first held that Ms. Robertson's retaliation claim against DHS for failing to promote her to the director position failed because she could not prove a "but-for" causal link between her protected activity—reporting discrimination—and DHS's decision not to promote her. With respect to her second retaliation claim, alleging that DHS continued

---

[1] The district court's jurisdiction was predicated on 28 U.S.C. § 1331; 42 U.S.C. § 2000e-5(f)(3).

[2] *See Palmer v. Marion Cty.*, 327 F.3d 588, 597 (7th Cir. 2003) (finding claim abandoned where party failed to defend it "in his district court brief in opposition to summary judgment" and failed to raise it in his appellate brief). In any event, an equal protection claim, if based on the same allegations underlying Ms. Robertson's Title VII claim, would not be tenable here. "[T]he right to be free from retaliation may be vindicated under the First Amendment or Title VII, but not the equal protection clause." *Boyd v. Ill. State Police*, 384 F.3d 888, 898 (7th Cir. 2004).

[3] *See Smith v. Bray*, 681 F.3d 888, 896 n.2 (7th Cir. 2012), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016) ("Title VII … authorizes suit only against the employer as an entity rather than against individual people who are agents of the employer.").

the retaliation against her through Ms. Evans, the court held that Ms. Robertson had failed to establish that she suffered an adverse action. Accordingly, the district court granted the defendants' motion and dismissed all claims. Ms. Robertson filed a timely notice of appeal.[4] She seeks reversal of the district court's grant of summary judgment.

We now affirm the district court's judgment. With respect to her failure-to-promote claim, DHS provided a non-retaliatory reason for choosing another candidate, and Ms. Robertson has failed to submit evidence that DHS's reason is pretextual. With respect to her claim alleging that DHS continued the retaliation through Ms. Evans, Ms. Robertson has failed to show that she suffered a materially adverse action.

## I.

## BACKGROUND

In October 2009, Ms. Robertson became the deputy director of Milwaukee Enrollment Services ("MilES"), a bureau within DHS. Employees of MilES are responsible for determining eligibility for medical assistance, FoodShare, child care, and caretaker supplement entitlements for Milwaukee

---

[4] Our jurisdiction is predicated on 28 U.S.C. § 1291. Ms. Robertson appealed the entirety of the district court's summary judgment decision. The caption of her brief includes Ms. Mattke and Ms. Evans as "Defendants-Appellees," but DHS contends that her "Statement of the Issues" confirms that she has abandoned all claims against these individual employees. Ms. Robertson does not respond to this point in her reply brief, nor does she raise any arguments with respect to the individual employees. We therefore conclude that DHS is the only appellee in this appeal.

residents. As deputy director, Ms. Robertson directly super-
vised ten to twenty employees and indirectly supervised
about 350 others.

In January 2014, an employee approached a section chief,
Juanita Brown-Small, and reported that the MilES bureau
director, Ed Kamin, had told her that he was going to "pimp
her out" to another agency.[5] Ms. Brown-Small reported this
complaint to Ms. Robertson, and the two then informed the
human resources department. An investigation took place
and concluded that Kamin had engaged in discriminatory
conduct. In April 2014, he resigned in lieu of termination.
Deputy administrator of DHS, Marlia Mattke, and assistant
deputy secretary of DHS, Kevin Moore, met with
Ms. Robertson and the section chiefs to inform them about
the resignation. At that time, Ms. Robertson and the section
chiefs said that they feared retaliation from management in
Madison (DHS headquarters) because Kamin had boasted
about his connections there.

After Kamin's removal, DHS officials designated
Ms. Robertson acting director of MilES and tasked her with
running the day-to-day operations. She reported to
Ms. Mattke, who worked in Madison. The operation ran
smoothly under Ms. Robertson's leadership.

In September 2014, DHS conducted open recruitment for
a new MilES director. It received fifty-seven applications,
including Ms. Robertson's. After screening the resumes and
conducting some interviews, DHS narrowed the field to
three applicants: Ms. Robertson, Danyel McNeil (another

---

[5] R.31 at 4.

No. 19-1179                                                                5

MilES employee), and Ms. Evans (not a MilES employee).
Ms. Mattke and Mr. Moore conducted the interviews.

During the second round of interviews, both Ms. Robert-
son and Ms. McNeil, as current MilES employees, were
asked how they would move the agency forward, given
Kamin's resignation. The interviewers did not pose the ques-
tion to Ms. Evans. Neither Mr. Moore nor Ms. Mattke main-
tained notes during the second round of interviews.
Mr. Moore recalled, however, that Ms. Robertson had dis-
cussed the importance of bridging the gap between Madison
and Milwaukee, a very important issue for MilES. Addition-
ally, Ms. Robertson, unlike Ms. Evans, had in-
come-maintenance experience, which was important to the
work at MilES. Mr. Moore had no concerns about
Ms. Robertson's candidacy after her interview. However, he
was concerned about Ms. Evans's lack of in-
come-maintenance experience and lack of experience work-
ing with the State of Wisconsin. He did not consider either of
these concerns to be barriers to Ms. Evans's success.[6]

---

[6]     Q.  Were there any negatives or concerns you had about
Ms. Evans?

A.  I would say that there were two. That she had never
done an income maintenance case and that she was not
from within state government. The former was one that I
figured, I was assuming that if that was—if we went
down that path, that she would be able to learn the in-
come maintenance process. And on the latter side, I as-
sumed that she wanted to become—she applied for a
state government position and that she wanted to for a
number of reasons, personally, professionally, whatever
it might be, that she viewed this as a move that would be
a positive for her.

(continued … )

Ms. Mattke testified, however, that she and Mr. Moore were impressed with Ms. Evans because of her strategic plan for MilES. Ms. Robertson and Ms. Evans had both led social services agencies, directed policy, managed supervisory-level employees, and headed organizations of over 150 employees. Ms. Robertson had five years of experience working for MilES. Ms. Evans had a master's degree in administration. DHS hired Ms. Evans.

For purposes of summary judgment, we must assume the correctness of Ms. Robertson's allegation that Ms. Evans, once chosen as director, antagonized, insulted, and undermined Ms. Robertson. According to Ms. Robertson, in her first meeting with Ms. Evans and Ms. Brown-Small, Ms. Evans commented that she "knew all about the last director leaving" and made references to the "prior director being forced to resign from his position."[7] Ms. Robertson understood these comments as a declaration by Ms. Evans that she would not be forced out as Kamin had been. At later meetings, Ms. Evans sat with her back to Ms. Robertson. Ms. Evans also made statements during meetings that implied Ms. Robertson had been doing things incorrectly while acting as interim director. When Ms. Robertson spoke at meet-

---

( … continued)
R.12 at 19 (Moore Dep. 73:14–74:1).

[7] R.31 at 18.

ings, Ms. Evans would roll her eyes[8] and tell Ms. Robertson to "be quiet."[9]

In Ms. Robertson's reply brief, she recounts that MilES hosted public meetings which were "a part of a class action settlement."[10] At these meetings, MilES staff, including Ms. Robertson, presented information detailing the agency's compliance with certain benchmarks established in the settlement of the lawsuit. Ms. Evans would talk over Ms. Robertson and show disrespect toward her at these meetings. Eventually, Ms. Robertson stopped attending.

Ms. Evans also revoked one of Ms. Robertson's job duties, resource allocation. According to Ms. Robertson, resource allocation was a key element of her job. To support this assertion, she points to Ms. McNeil's testimony that "making timely changes to resource allocation was an area in which Ms. Robertson excelled … due to her extensive knowledge of income maintenance and her extensive knowledge of the strength and weaknesses of the staff."[11]

As the direct manager of the section chiefs, Ms. Robertson had to meet regularly with them. However, Ms. Evans discouraged section chiefs from meeting with

---

[8] R.24 at 4 (Thomson Decl. ¶ 17).

[9] R.28 at 6 (Brown-Small Decl. ¶ 22); R.25 at 6 (McNeil Decl. ¶ 25).

[10] Appellant's Reply Br. 3–4.

[11] Appellant's Reply Br. 5 (alteration in original) (quoting R.25 at 5 (McNeil Decl. ¶ 21)).

Ms. Robertson and eventually demanded to be present any time a section chief met with Ms. Robertson.

Dana Thomson, a unit chief at MilES, testified that Ms. Evans treated Ms. Robertson worse than she treated two section chiefs, Mike Poma and Jerry Turner, who had not participated in the Kamin investigation. Ms. Thomson noted, for instance, that when Mr. Poma fell asleep during a meeting, Ms. Evans did not reprimand him.

On February 20, 2015, Ms. Robertson emailed Ms. Mattke and Mr. Moore to request a meeting to discuss her "unhealthy" work environment.[12] Specifically, Ms. Robertson explained that she believed her "authority as a Deputy Director has been diminished over the last few months."[13]

Ms. Mattke responded to the meeting request by offering a date and time but also stated that Ms. Evans would have to be present. Ms. Robertson responded that she did not want Ms. Evans included in the meeting. When Ms. Mattke asked why, Ms. Robertson responded that she was not comfortable discussing her concerns in Ms. Evans's presence. One hour later, Ms. Evans emailed the entire MilES staff and directed them to speak with a direct supervisor before contacting human resources. Ms. Evans justified this step as necessary because of the "great demands" being placed on human resources.[14] This policy change would have required Ms. Robertson to address her concerns to Ms. Evans before

---

[12] R.29-2 at 2.

[13] *Id.*

[14] R.18-1 at 1.

speaking to human resources. Jennifer Potts, who worked in human resources at MilES, believed that the policy could have had a chilling effect on employees who wanted to speak with human resources—especially if the employee's problem related to her manager.[15] Mr. Moore and Ms. Mattke also testified that they were concerned that such a policy would silence people and create a hostile working environment.[16]

Ms. Brown-Small and Ms. Thomson both stated that Ms. Evans created an environment worse than the one that had existed under Kamin's management. Ms. McNeil resigned from MilES in October 2016, and Ms. Thomson resigned from MilES in February 2017 due to Ms. Evans's harassment.

## II.

## DISCUSSION

## A.

We review the district court's grant of summary judgment de novo and construe all facts and reasonable inferences in favor of Ms. Robertson, the non-moving party. *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 694 (7th Cir. 2017). Federal Rule of Civil Procedure 56 permits the grant of summary judgment only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party

---

[15] R.27 at 2 (Potts Decl. ¶ 10).

[16] R.12 at 13 (Moore Dep. 50:13–23); *see* R.13 at 9 (Mattke Dep. 33:11–23).

needs more than a scintilla of evidence, however, to defeat summary judgment. … [T]he non-movant must show 'that a discriminatory reason *more likely* motivated [the employer's] decision or that [its] proffered explanations are *unworthy* of credence.'" *Senner v. Northcentral Tech. Coll.*, 113 F.3d 750, 757–58 (7th Cir. 1997) (alteration in original) (quoting *Courtney v. Biosound, Inc.*, 42 F.3d 414, 418 (7th Cir. 1994)).

Title VII prohibits an employer from discriminating against employees on the basis of race and sex, among other protected classifications. 42 U.S.C. § 2000e-2(a). Title VII's anti-retaliation provision provides that it is unlawful for an employer to discriminate against its employee because the employee filed a complaint or participated in an investigation of an unlawful employment practice. *See id.* § 2000e-3(a). This provision "seeks to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms … by prohibiting employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and employers." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997)).

To succeed on a Title VII retaliation claim, a plaintiff "must produce enough evidence for a reasonable jury to conclude that (1) she engaged in a statutorily protected activity; (2) the [employer] took a materially adverse action against her; and (3) there existed a but-for causal connection between the two." *Burton*, 851 F.3d at 695; *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016).

When the plaintiff establishes a prima facie case of retaliation, an employer may produce evidence which, if taken as true, would permit the conclusion that it had a legitimate

non-discriminatory reason for taking the adverse employ-
ment action. *See Lord*, 839 F.3d at 564. If the employer meets
this burden, the plaintiff, to avoid summary judgment, then
must produce evidence that would permit a trier of fact to
establish, by a preponderance of the evidence, that the legit-
imate reasons offered by the employer were not its true rea-
sons but were a pretext for discrimination. *Argyropoulos v.
City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008). In determining
whether the employer's reason can be characterized as pre-
textual, we do not evaluate whether the employer's prof-
fered justification was accurate or even whether it was un-
fair. Our sole focus is on whether the employer's stated rea-
son can be characterized as a falsehood rather than an hon-
estly held belief. *Harper v. C.R. England, Inc.*, 687 F.3d 297,
311 (7th Cir. 2012); *O'Leary v. Accretive Health, Inc.*, 657 F.3d
625, 635 (7th Cir. 2011).

**B.**

**1.**

Ms. Robertson claims that DHS retaliated against her in
violation of Title VII when it did not select her for the direc-
tor position. Rejection of her candidacy was, she maintains,
in retaliation for her having complained about Kamin's dis-
criminatory activities in the workplace. The district court did
not accept this contention; in its view, Ms. Robertson failed
to demonstrate that the rejection of her application was
caused by her participation in the Kamin investigation. Ac-
cording to the district court,

> [w]ith respect to the failure-to-promote claim,
> the defendants agree that Robertson engaged
> in statutorily protected activity by reporting

Kamin's discriminatory conduct and that Rob-
ertson suffered an actionable adverse action by
not being chosen for the director position.
Therefore, the only element in dispute is
whether Robertson's complaint about Kamin
was the but-for cause of DHS's decision not to
promote her to director.[17]

The district court then determined that Ms. Robertson
had not submitted evidence to establish that her complaint
about Kamin's activity had caused the rejection of her appli-
cation. After examination of the record, we must agree with
the district court's conclusion that Ms. Robertson does not
have direct evidence establishing causation. She therefore
"must rely on circumstantial evidence like suspicious tim-
ing, ambiguous statements, treatment of similarly-situated
employees, and any other relevant information that could
permit an inference of retaliation." *Burton*, 851 F.3d at 697.
The "dispositive question" is "whether a reasonable
[fact-finder] could find a but-for causal link between the pro-
tected activities and adverse actions at issue." *Id.*

Ms. Robertson attempts to shoulder the burden of estab-
lishing causation by arguing that she was "objectively the
most qualified candidate,"[18] and that DHS's failure to recog-
nize this reality in its decisionmaking is therefore powerful
circumstantial evidence that her participation in the Kamin
investigation was the cause of her non-selection. She stresses
that she alone had experience in the area of income mainte-

---

[17] R.34 at 9 (internal citation omitted).

[18] Appellant's Br. 31.

No. 19-1179                                                           13

nance. The successful candidate, Ms. Evans, had no experience in this area and could only offer superior educational qualifications, which were not a necessary qualification for the job. Ms. Robertson, who had experience working for the State, also contends that Ms. Evans's lack of experience working for the State caused concern for at least one of the decisionmakers.[19] Ms. Robertson also noted that, unlike Ms. Evans, she had experience managing a large organization.[20]

Ms. Robertson admits that Mr. Moore and Ms. Mattke explained that they were "looking for a candidate with a vision and an ability to lead" and who could improve the office's communication with the operation in Madison.[21] She

---

[19] R.12 at 19 (Moore Dep. 73:14–74:1).

[20] Ms. Robertson had five years' experience supervising the entire MilES staff of over 300 employees. Ms. Evans had only two years' experience supervising a staff of 156 employees. Ms. Robertson contends that a jury could conclude that she had "superior qualifications in managing large organizations." Appellant's Br. 34.

[21] Appellant's Br. 35.

> Q. What were you looking for in a bureau director?
>
> A.  I was looking for a leader who could manage internally and externally a very highly visible portion of our business, of our programs.
>
> Q. And how were you intending to be able to assess this from the potential candidates?
>
> A. How the respondents, how they answered questions, what their vision was, how they are—just the discussion in my mind was important to know because of the exposure of this position that, you know, I was looking for
>
> (continued … )

No. 19-1179

submits that she had the right to argue to a jury that, because of her participation in the Kamin investigation, the selection committee considered her to be "less cooperative with management in Madison, … less trustworthy, or as hav[ing] less of a vision going forward."[22] She suggests that, in making the determination, the decisionmakers might have relied on evidence that Kamin had friends in the Madison office—friends who would be hostile to her. Finally, she suggests that Kamin had a close relationship with the decisionmakers that influenced the decision not to appoint her because of

---

( … continued)

> a—somebody who could really kind of take MilES and move it forward.
>
> Q. Any particular skill set or experience you were looking for?
>
> A. I was looking for interpersonal skills. I was looking for just general, you know, understanding of challenging situations. Leadership.

R.12 at 16 (Moore Dep. 64:6–22).

> Q. Did you have any concern that she didn't have any income maintenance experience?
>
> A. I didn't.
>
> Q. And why not?
>
> A. Because we felt like with this position, the key is having a really good leader, and income maintenance is something the staff can support and you can learn from staff, but the leadership skills were most important.

R.13 at 20 (Mattke Dep. 77:6–14).

[22] *Id.*

her role in the investigation. She also notes that the deci-sionmakers asked only the candidates who had participated in the investigation whether they could function as director in the aftermath of the investigation.[23]

Ms. Robertson believes that this evidence establishes a causal connection between her participation in the Kamin investigation and her non-selection for the director position. However, because DHS presented a non-retaliatory reason for the adverse action, the controlling question at the bottom of this case is "whether the proffered reasons were pretext for retaliation." *Burton*, 851 F.3d at 697. DHS's non-retaliatory reason for hiring Ms. Evans over Ms. Robertson is that Ms. Evans was the better overall can-didate. Ms. Robertson must therefore show that the record would support a determination that this reason was pre-textual. "In determining whether an employer's stated rea-son is pretextual, '[t]he question is not whether the employ-er's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to ex-plain the discharge.'" *Harper*, 687 F.3d at 311 (alteration in original) (quoting *O'Leary*, 657 F.3d at 635). To meet this burden, Ms. Robertson therefore "'must identify such weak-nesses, implausibilities, inconsistencies, or contradictions'" in DHS's stated reason that would permit a reasonable per-son to conclude that the stated reason was "'unworthy of credence.'" *Id.* (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007)).

---

[23] *Id.* at 38–39.

The record shows that both candidates presented attractive qualifications. Ms. Robertson had diverse experience and, importantly, had extensive experience working in income maintenance. Ms. Robertson also had supervised directly employees and large staffs for years. She did not have, however, a college education. Ms. Evans, on the other hand, had slightly more diverse experience. She, like Ms. Robertson, had leadership experience and had supervised directly employees. Head Start hired Ms. Evans when it was in noncompliant status. When she left, it was fully compliant. Ms. Evans had a master's degree in administration. However, she did not have prior experience in income maintenance.

Mr. Moore and Ms. Mattke explained that they were looking for a candidate with a vision and the ability to lead. Mr. Moore was also hoping to find an individual who could improve the communication between Madison and Milwaukee. He admitted that Ms. Robertson successfully addressed this concern in her interview. During the second interview, however, the interviewers asked Ms. Evans and Ms. Robertson to complete a writing sample that involved interpreting a policy. According to Ms. Mattke, Ms. Robertson did not offer big picture ideas or a strategic vision for MilES. Instead, Ms. Robertson discussed continuing the good work MilES was already doing. Ms. Mattke consequently believed that Ms. Robertson would be better at running day-to-day activities rather than developing leadership and strategic vision. Ms. Evans, by contrast, discussed her prior experience leading an organization under federal scrutiny and the decision that she made to bring her team together and move forward.

No. 19-1179                                                          17

Ms. Robertson contends that to determine why DHS chose to hire Ms. Evans over Ms. Robertson requires an examination of DHS's intent and credibility, factors "which must go to a jury unless 'no rational factfinder could draw the contrary inference.'"[24] She attempts to establish pretext by contending that: (1) she was objectively the most qualified candidate; (2) a jury could conclude that DHS's subjective desire to select a candidate with "vision" was pretext for choosing someone other than Ms. Robertson; and (3) the interview process was biased because Mr. Moore "admits to having worked closely with Director Kamin" and Ms. Mattke "shared with Director Kamin pictures of her new baby while she was on leave."[25]

Ms. Robertson's contention that she was better qualified cannot carry the day for her. An employee's "own opinions about [her] … qualifications [do not] give rise to a material factual dispute." *Rabinovitz v. Pena*, 89 F.3d 482, 487 (7th Cir. 1996). "'[U]nless [the competing qualifications] are so favorable to the plaintiff that there can be *no dispute* among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue,'" the plaintiff's qualifications alone do not establish evidence of pretext. *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180 (7th Cir. 2002) (emphasis added) (quoting *Deines v. Texas Dep't of Protective and Regulatory Servs.*, 164 F.3d 277, 279 (5th Cir. 1999)).

---

[24] Appellant's Br. 31 (quoting *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 633 (7th Cir. 2009)).

[25] Appellant's Br. 36–37.

Nor, on these facts, does timing establish a genuine dispute of material fact. Roughly seven months passed after Ms. Robertson reported Kamin's conduct before DHS hired Ms. Evans as the new director. *See Burton*, 851 F.3d at 698 ("While the six-month gap does not preclude Burton's claim as a matter of law, it does substantially weaken it."). Additionally, during the time between Ms. Robertson's complaint and the alleged retaliation, DHS gave Ms. Robertson the role of interim director, and she was selected as a final-round interviewee for the permanent director position. As the district court noted, "[t]his evidence flies in the face of Robertson's theory … ."[26]

In short, Ms. Robertson has failed to "identify such weaknesses, implausibilities, inconsistencies, or contradictions" in DHS's stated reason for hiring Ms. Evans over her "that a reasonable person could find [it] unworthy of credence." *Harper*, 687 F.3d at 311 (alteration in original) (quoting *Boumehdi*, 489 F.3d at 792). *See Argyropoulos*, 539 F.3d at 736 (In "assessing a plaintiff's claim that an employer's explanation is pretextual, we do not … 'second-guess[] an employer's facially legitimate business decision[].'") (quoting *Culver v. Gorman & Co.*, 416 F.3d 540, 547 (7th Cir. 2005)).

DHS was therefore entitled to summary judgment because there is no material issue of fact as to whether its reason for not hiring Ms. Robertson is pretext for retaliation. *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 640–41 (7th Cir. 2008) (stating that "'[a] genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party ex-

---

[26] R.34 at 14.

ists to permit a jury to return a verdict for that party'") (quoting *Springer v. Durflinger*, 518 F.3d 479, 483 (7th Cir. 2008)).

### 2.

Ms. Robertson also submits that DHS violated Title VII by retaliating against her through the actions of its new director, Ms. Evans. She claims that Ms. Evans treated her poorly and created a hostile workplace. She submits that, shortly after hiring her, DHS higher management informed Ms. Evans about Ms. Robertson's involvement in the Kamin investigation and that Ms. Evans thereafter continued management's retaliation.

The district court determined that Ms. Robertson failed to show that Ms. Evans's actions amounted to a *materially* adverse action against her. To succeed on this claim, Ms. Robertson must show that Ms. Evans's actions would have been materially adverse to a reasonable employee, such that a reasonable employee would have been deterred from making or supporting an investigation of discrimination. *Burlington N.*, 548 U.S. at 57. Although the challenged actions need not be employment-related, *id.* at 67, our previous cases indicate that challenged actions involving the reassignment of job responsibilities are typically not materially adverse unless there is a "*significant* alteration to the employee's duties, which is often reflected by a corresponding change in work hours, compensation, or career prospects." *Stephens v. Erickson*, 569 F.3d 779, 791 (7th Cir. 2009). We judge each case "from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Burlington N.*, 548 U.S. at 71 (internal quotation marks omitted)

(quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).

First, Ms. Robertson contends that a reasonable jury could find that Ms. Evans was made aware of the details of the Kamin investigation because Ms. Evans said to Ms. Brown-Small, "So you are the one who made the report about Mr. Kamin."[27] Ms. Robertson alleges that various retaliatory actions of Ms. Evans purportedly established a materially changed work environment. For example, she cites as evidence Ms. Evans's body language, "cold shoulder,"[28] and statements such as "be quiet" and, "[I] need[] to clean up the poor morale Ms. Robertson created by Mr. Kamin's forced resignation."[29]

Under the rules governing summary judgment, we must assume that Ms. Evans did and said everything that Ms. Robertson attributes to her. Ms. Robertson nevertheless fails to show that she suffered a materially adverse action in the workplace. "'[S]nubbing by supervisors and co-workers'" is not actionable. *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1107 (7th Cir. 2012) (quoting *Burlington N.*, 548 U.S. at 68). Similarly, "[u]nfair reprimands or negative performance reviews, unaccompanied by tangible job consequences, do not suffice … ." *Boss v. Castro*, 816 F.3d 910, 919 (7th Cir. 2016). In other words, "Title VII protects against discrimination, not 'personal animosity or juvenile behav-

---

[27] R.28 at 5 (Brown-Small Decl. ¶ 18).

[28] Appellant's Br. 8.

[29] *Id.* at 20–21.

ior.'" *Brown*, 700 F.3d at 1105 (quoting *Shafer v. Kal Kan Foods, Inc.*, 417 F.3d 663, 666 (7th Cir. 2005)).[30]

The district court is correct that *Brown* is instructive. There, two employees sued their employer alleging racial discrimination. The employees were not formally disciplined, terminated, or denied pay or benefits, but they alleged that their employer did not listen to them, gave them a "cold shoulder," and wrongly accused them of being "cry bab[ies]" and "trouble maker[s]." *Id.* at 1107 (alteration in original). We held that this behavior did not constitute "a

---

[30] In 2016, several employees complained to Ms. Mattke that Ms. Robertson had acted in an unprofessional manner. Following standard practice, DHS initiated a personnel investigation which was conducted by investigators from the Department of Administration's Division of Personnel Management. These investigators had not previously been involved in any MilES investigations. They interviewed twenty current and former MilES employees, including Ms. Robertson and four individuals with whom she requested they speak. *See* R.17 at 6 (Mattke Decl. ¶¶ 21–22); R.15 at 29 (Robertson Dep. 113:10–19).

The investigators determined that Ms. Robertson had violated two DHS work rules by engaging in acts of mismanagement and unprofessional and disrespectful behaviors. As a result of the investigation, Ms. Robertson was demoted and her salary decreased by $2.80 per hour. *Id.* at 6–7 (Mattke Decl. ¶ 24); R.15 at 35 (Robertson Dep. 138:6). Although Ms. Robertson "believe[s] the complaint was fabricated as part of retaliation and [she] was demoted [as a result]," she admits that she does not know whether Ms. Evans had any control over the demotion. R.15 at 35 (Robertson Dep. 137:17–138:1).

Ms. Robertson's conclusory statement that the complaint filed against her was "fabricated" lacks sufficient elaboration and evidence. Moreover, Ms. Robertson herself concedes that her demotion is not relevant in this litigation. R.20 at 18–19 ¶ 81; R.23 at 13 ¶ 81.

materially adverse employment action." *Id.* The behavior easily fell into the "non-actionable category"—even assuming that the comments referred to the plaintiffs' discrimination complaints. *Id. See, e.g., Dunn v. Washington Cty. Hosp.*, 429 F.3d 689, 690–93 (7th Cir. 2005) (nurse complained that a doctor sexually harassed her, and doctor responded by asking the nurse to withdraw her complaint in a "nasty and uncivil tone" and told her that "paybacks are hell" but took no other action and therefore did not cause any actionable injury); *see also Stephens*, 569 F.3d at 790 ("[B]eing stared and yelled at … is not an actionable harm.").

Assessed against these precedents, Ms. Evans's behavior cannot be characterized as materially adverse—causing "a significant or substantial change"—to her job responsibilities. *Stephens*, 569 F.3d at 790. Although Ms. Robertson alleges that Ms. Evans prevented Ms. Robertson from "doing a key element of her job, which was human resource allocation for the approximately 350 staff members,"[31] she gives no more detail in her brief than this as to what "resource allocation" entails. Nor does she discuss "resource allocation" in her deposition. Ms. Robertson appears to have first contended that "resource allocation" was a "key element of her job" in her brief in opposition to the motion for summary judgment.[32]

The other changes to Ms. Robertson's job, as developed in the record, do not rise to the level of "materially adverse" either. First, Ms. Robertson provides testimony of an attor-

---

[31] Appellant's Br. 21.

[32] R.21 at 15.

ney who attended the public meetings who observed that Ms. Robertson was not allowed to freely communicate with the public as she had always done in the past.[33] Instead, Ms. Evans spoke over Ms. Robertson and advised her not to answer community member questions. As a result, Ms. Robertson stopped going to community meetings. Second, Ms. Robertson alleges that Ms. Evans interfered with Ms. Robertson's ability to have meetings with the employees she supervised. Ms. Brown-Small testified that if she met with Ms. Robertson, Ms. Evans would say, "How can you be doing your job if you are meeting with Vanessa?"[34] Because of these interruptions, Ms. McNeil testified, "the continuation of any meeting [with Ms. Robertson was made] pointless."[35]

Ms. Robertson, however, does not provide evidence that these meetings were a job responsibility of hers. With respect to Ms. Robertson's meetings with the section chiefs she directly supervised, the record indicates that Ms. Evans "discouraged" the weekly meetings and that as a result the meetings occurred "more on a monthly basis."[36] The record fails to establish that these meetings were a job responsibility, or that they needed to occur on a weekly basis. With respect to the community meetings, Ms. Robertson established that MilES staff presented at these meetings and that she was "an

---

[33] R.26 at 2–4 (DeLessio Decl. ¶¶ 6–7, 12, 14).

[34] R.28 at 8 (Brown-Small Decl. ¶ 27).

[35] R.25 at 6–7 (McNeil Decl. ¶ 32).

[36] R.28 at 8 (Brown-Small Decl. ¶ 28).

excellent resource at these meetings," but she does not establish that speaking at these meetings was a job responsibility of hers.[37] Ms. Brown-Small observed that, because "Ms. Robertson had always been an active participant in these meetings," it was "very embarrassing for Ms. Robertson" when Ms. Evans told Ms. Robertson not to speak at the meetings.[38] Being an "active participant" in and an "excellent resource" at an activity, however, is not synonymous with that activity being a job responsibility. The district court correctly held that "there [was] no evidence that the loss of this particular duty was a 'significant or substantial change' to her responsibilities such that it was materially adverse."[39]

Even if these job functions do constitute job responsibilities, Ms. Robertson does not show that Ms. Evans's interference with them was materially adverse. "Whether a change in job responsibilities is materially adverse 'all depends on how much of a change, and how disadvantageous a change, took place.'" *Stephens*, 569 F.3d at 791 (quoting *Sitar v. Indiana Dep't of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003)). A reassignment of job duties is not "materially adverse" unless it is a "significant" change that is "often reflected by a corresponding change in work hours, compensation, or career prospects." *Id.* Ms. Robertson does not provide any details about her former resource allocation duties, nor does she al-

---

[37] R.26 at 2–3 (DeLessio Decl. ¶¶ 6–7).

[38] R.28 at 8 (Brown-Small Decl. ¶ 29).

[39] R.34 at 17 (quoting *Stephens*, 569 F.3d at 790).

No. 19-1179                                                    25

lege that any of the ways in which Ms. Evans interfered with her ability to hold meetings resulted in a "corresponding change in work hours, compensation, or career prospects." *Stephens*, 569 F.3d at 791.

As the district court stated, "[w]ithout having produced sufficient evidence that she suffered an adverse action, Robertson's retaliation claim [alleging that DHS continued its retaliation through the actions of Ms. Evans] cannot proceed to trial."[40] We cannot conclude from the record that a reasonable person in Ms. Robertson's situation would have been dissuaded from participating in an investigation of discrimination. The district court was correct in granting DHS summary judgment on this issue.

## Conclusion

The district court correctly granted summary judgment. With respect to her failure-to-promote claim, DHS provided a non-retaliatory reason for hiring Ms. Evans (she was the better candidate), and Ms. Robertson failed to show that there was a genuine issue of material fact as to whether that proffered reason was pretext. With respect to her claim that DHS continued its retaliation through Ms. Evans, Ms. Robertson also failed to produce sufficient evidence that she suffered a materially adverse action.

We therefore affirm the judgment of the district court.

                                                         AFFIRMED

---

[40] R.34 at 18.

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

**FINAL JUDGMENT**

February 7, 2020

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

| | |
|---|---|
| No. 19-1179 | VANESSA ROBERTSON,<br>Plaintiff - Appellant<br><br>v.<br><br>STATE OF WISCONSIN DEPARTMENT OF HEALTH SERVICES, et al.,<br>Defendants - Appellees |
| **Originating Case Information:** | |
| District Court No: 2:18-cv-00116-JPS<br>Eastern District of Wisconsin<br>District Judge J. P. Stadtmueller | |

The judgment of the District Court is **AFFIRMED**, with costs, in accordance with the decision of this court entered on this date.

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## NOTICE OF ISSUANCE OF MANDATE

March 2, 2020

To:    Stephen C. Dries
        UNITED STATES DISTRICT COURT
        Eastern District of Wisconsin
        Milwaukee , WI 53202-0000

| No. 19-1179 | VANESSA ROBERTSON,<br>Plaintiff - Appellant<br><br>v.<br><br>STATE OF WISCONSIN DEPARTMENT OF HEALTH SERVICES, et al.,<br>Defendants - Appellees |
|---|---|
| **Originating Case Information:** ||
| District Court No: 2:18-cv-00116-JPS<br>Eastern District of Wisconsin<br>District Judge J. P. Stadtmueller ||

Herewith is the mandate of this court in this appeal, along with the Bill of Costs, if any. A certified copy of the opinion/order of the court and judgment, if any, and any direction as to costs shall constitute the mandate.

RECORD ON APPEAL STATUS:    No record to be returned

**NOTE TO COUNSEL:**

If any physical and large documentary exhibits have been filed in the above-entitled cause, they are

to be withdrawn ten (10) days from the date of this notice. Exhibits not withdrawn during this period will be disposed of.

Please acknowledge receipt of these documents on the enclosed copy of this notice.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Received above mandate and record, if any, from the Clerk, U.S. Court of Appeals for the Seventh Circuit.

**Date:**                                                 **Received by:**

     3/2/2020                                            Lisa M. Forseth

_____               _____

form name: **c7_Mandate**(form ID: **135**)